## UNITED STATES DISTRICT COURT

## DISTRICT OF MINNESOTA

| | |
|---|---|
| TAU, INC., | Civil No. 12-3141 (JRT/JSM) |
| Plaintiff, | |
| v. | **MEMORANDUM OPINION AND ORDER ON MOTION FOR PRELIMINARY INJUNCTION** |
| ALPHA OMICRON PI FRATERNITY, INC. and ALPHA OMICRON PI PROPERTIES, INC., | |
| Defendants. | |

Ryan M. Sugden and Anh Le Kremer, **LEONARD STREET AND DEINARD, PA**, 150 South Fifth Street, Suite 2300, Minneapolis, MN 55402, for plaintiff.

John I. Harris, III, **SCHULMAN LEROY & BENNETT PC**, 501 Union Street Seventh Floor, P.O. Box 190676, Nashville, TN 37219; James S. Reece and Michael G. Patiuk, **THOMPSON, COE, COUSINS & IRONS, LLP**, 408 Saint Peter Street, Suite 510, St. Paul, MN 55102,[1] for defendants.

Plaintiff Tau, Inc. ("Tau") is a Minnesota corporation affiliated with the chapter of the Alpha Omicron Pi Fraternity located at the University of Minnesota. Tau owns property and a residential building which has provided housing to collegiate members of the University of Minnesota's Alpha Omicron Pi Fraternity for over eighty years. Tau brings this action against Defendants Alpha Omicron Pi Fraternity, Inc. ("AOII") and Alpha Omicron Pi Properties, Inc. ("AOII Properties") alleging that Defendants have

---

[1] Michelle Kreidler Dove and Pamela Steinle of the Bassford Remele firm appeared and argued on behalf of defendants at the hearing on this motion. Bassford Remele has since withdrawn from the case. (Notice of Withdrawal as Attorney, Feb. 12, 2013, Docket No. 44.)

unlawfully taken over Tau's corporate governance and finances and are threatening to mortgage or sell Tau's real property.

The case is now before the Court on Tau's motion for a preliminary injunction.[2] For the reasons explained below, the Court will grant in part and deny in part Tau's motion for a preliminary injunction.

## BACKGROUND

## I.     HISTORY AND ORGANIZATION OF AOII

Defendant AOII is a nonprofit fraternity for women that was established in 1897. (Decl. of Troylyn LeForge ¶ 2, Jan. 4, 2013, Docket No. 19.)   AOII is headquartered in Tennessee and has 120 active collegiate chapters in the United States and Canada.  (*Id.* ¶¶ 1-2.)  AOII's constitution states that the organization's object is "to establish, operate, and maintain a non-profit international fraternity, with undergraduate chapters at various colleges and universities in the United States and Canada, and with alumnae chapters in specified geographical areas."  (*Id.*, Ex. A at 2.)

AOII is governed by a constitution, bylaws, standing rules, and a book of policies. (*Id.*, Ex. A.)   AOII's constitution and bylaws were amended in June 2011, and the standing rules and book of policies became effective in February 2012.  (*Id.*, Ex. A at 1.)

---

[2] Tau styled its motion as solely one for a temporary restraining order, and included in its motion a request "for an evidentiary hearing on a motion to be filed by Tau for a preliminary injunction."  (Mot. for Temporary Restraining Order at 2, Dec. 19, 2012, Docket No. 2.)  The parties agreed at oral argument that the record was sufficient for the Court to determine the propriety of a preliminary injunction, and that an evidentiary hearing was unnecessary. Therefore, the Court considers Tau's motion as one for a preliminary injunction.

AOII is run by an executive board, consisting of an elected president, vice president of finance, and six vice presidents.  (*Id.*, Ex. A at 3.)  The executive board also functions as AOII's corporate board of directors.  (*Id.*, Ex. A at 4.)  Additionally, AOII has a legislative body which is comprised primarily of past AOII presidents, the executive board, and presidents of the collegiate and alumnae chapters.  (*Id.*)

Pursuant to its constitution, AOII has two types of chapters: collegiate and alumnae.  (*Id.*, Ex. A at 3.)  Collegiate chapters are associated with a single college or university, and each chapter has the authority to initiate new members.  (*Id.*)  Each collegiate chapter also has its own governance structure, comprised of a president, treasurer, secretary, and other officers as prescribed by AOII's standing rules.  (*Id.*)  Alumnae chapters are organized for specific geographical areas, and are similar to collegiate chapters, although they lack the right to initiate new members into AOII.  (*Id.*)

AOII's governing documents explicitly grant AOII the right to control certain aspects and functions of the chapters.  (*Id.* ¶ 7.)  For example, AOII has the sole authority to form collegiate chapters by issuing a charter, defines the requirements for initiating new members, sets dues, and specifies the meetings, officers, and committees that each chapter must have.  (*See id.*, Ex. A at 20-24, 26.)  AOII also has the authority to place chapters on probation, and can withdraw a chapter's charter.  (*Id.*, Ex. A at 32-35.)

## II.   THE TAU CORPORATION

AOII established a collegiate chapter at the University of Minnesota ("the Minnesota Chapter")[3] on October 29, 1912.  (*Id.* ¶ 4.)  As of December 2012, there were 119 collegiate members of the Minnesota Chapter.  (*Id.* ¶ 5.)  Each collegiate chapter may also be associated with an affiliated chapter corporation.  Plaintiff Tau is the affiliated chapter corporation of the Minnesota Chapter.  Such corporations are an essential piece of the fraternity structure because collegiate chapters themselves are prohibited from taking certain actions.  For example, AOII prohibits chapters from purchasing or leasing housing.  (*Id.*, Ex. A at 46.)[4]

Tau was originally incorporated as "Alpha Omicron Pi Society of Minnesota" on May 25, 1921.  (First Decl. of Heather Essig-Reinhardt, Ex. B at 6, Dec. 19, 2012,

---

[3] It appears from the documentary evidence submitted by the parties that the Minnesota Chapter is generally referred to as the "Tau Chapter."  However, to avoid any confusion in this Order as to actions taken by the Tau **chapter** or Plaintiff Tau **corporation**, the Order refers to the chapter as the Minnesota chapter, and the Plaintiff corporation as Tau.

[4] AOII's executive director contends that these affiliated chapter corporations "are essentially subsidiary holding companies of AOII" and that AOII's governing documents give AOII the right to create affiliated chapter corporations.  (LeForge Decl. ¶ 8.)  AOII does not identify any provisions of the governing documents themselves which establish that AOII can create affiliated chapter corporations, or that affiliated chapter corporations are "subsidiary holding companies" of AOII.  AOII further alleges that volunteers who serve as officers or directors of affiliated chapter corporations "serve in a fiduciary capacity solely on behalf of and for the benefit of AOII as a whole."  (*Id.* ¶ 9.)  This allegation may be premised on an incorrect understanding of Tau's obligations, as all chapter corporations are organized under state law, and therefore their directors owe duties to the corporation and the members consistent with state law. *See, e.g.*, *Shepard of the Valley Lutheran Church of Hastings v. Hope Lutheran Church of Hastings*, 626 N.W.2d 436, 442 (Minn. Ct. App. 2001) ("An officer of a nonprofit corporation owes a fiduciary duty to that corporation to act in good faith, with honesty in fact, with loyalty, in the best interests of the corporation, and with the care of an ordinary, prudent person under similar circumstances.").

Docket No. 4.)[5]   The original articles of incorporation state that the purpose of the corporation "shall be the educational, literary and social culture of its members, and to provide a Society House or rooms within which its members may live and hold meetings and furnish and operate the same." (*Id.*, Ex. B at 4.)

In 1942, Alpha Omicron Pi Society of Minnesota changed its name to Tau of Alpha Omicron Pi, Inc. (*Id.*, Ex. A.) And in October 2012, the name was changed to Tau, Inc.[6] (*Id.*, Ex. C.) As of December 3, 2012, there were forty-four paid members of Tau. (Decl. of Lynne Hardey ¶ 3, Dec. 19, 2012, Docket No. 6.) As of December 17, 2012, there were eighty paid members of Tau. (*Id.* ¶ 4.)

## A.    Tau's Governing Documents

### 1.    The Tau Bylaws

Tau contends that prior to October 29, 2012, it was governed by a set of bylaws ("the Tau Bylaws").[7] The Tau Bylaws provide that members of the Minnesota Chapter and any other alumnae members of AOII over the age of eighteen are eligible for

---

[5] AOII asserts that **it** established the Alpha Omicron Pi Society of Minnesota, and did so "for the sole purpose of funding the purchase and maintenance of a residential house for AOII's collegiate members. AOII alumnae volunteers handled the formation of this local corporation for the benefit of AOII and its collegiate chapter." (LeForge Decl. ¶ 10.) Other than a statement in a declaration, AOII has presented no evidence that it established the corporation Alpha Omicron Pi Society of Minnesota. The articles of incorporation simply show that the corporation now known as Tau was established by a group of individual women, including Kathryn Bremer Matson, Tau's first president, and says nothing about whether these women were acting on behalf of AOII. (First Essig-Reinhardt Decl., Ex. B.)

[6] The Court will refer to the corporate entity, in all time periods, as Tau.

[7] Tau did not include these bylaws in its complaint or any of its moving papers, but submitted the bylaws prior to oral argument pursuant to the Court's request.

membership in Tau.  (Tau Bylaws at 1.)  To become a member, an eligible individual must submit an application and pay a $45 fee.  (*Id.*)  The applicant's name is then placed in Tau's membership book, which is maintained by Tau's treasurer.  (*Id.*; Hardey Decl ¶ 2.)

The Tau Bylaws indicate in a handwritten change to the typewritten form that Tau's annual corporate meeting is to be held in October.  (Tau Bylaws at 3.)  Pursuant to the Tau Bylaws, notice of the annual meeting is to be mailed to all members at least ten days prior to the meeting.  (*Id.*)  A special meeting may be held at any time if called by the president, a majority of Tau's Board, or any ten members in good standing of Tau. (*Id.*)  The Tau Bylaws provide for their amendment only by an affirmative vote of the majority of the members present at a regular annual meeting, or at a special meeting called for the purpose of amending the bylaws if the proposed amendment is included in the notice of the special meeting.  (*Id.* at 6.)  The Tau Bylaws provide that the articles of incorporation can be amended in the same manner as the bylaws.  (*Id.* at 7.)

The Tau Bylaws do not contain any provision mentioning AOII or otherwise indicating that Tau is governed by AOII.  (*See generally* Tau Bylaws.)

## 2.   The Amended Tau Bylaws

At an October 29, 2012 meeting, Tau allegedly amended its bylaws ("the Amended Tau Bylaws").[8]  The Amended Tau Bylaws extend eligibility for membership in Tau to any AOII member, whether or not they are a member of the Minnesota Chapter,

---

[8] Tau also failed to include this set of bylaws in its complaint or any of its moving papers, but submitted the amended bylaws prior to oral argument pursuant to the Court's request.

who submits an application and is approved by a majority vote of Tau's members. (Amended Tau Bylaws at 1.)

The Amended Tau Bylaws provide that the annual meeting shall be held upon the call of the Board of Directors. (*Id.* at 2.) Notice of the meeting must be provided at least five days prior to the meeting to each member of Tau. (*Id.*) The Amended Tau Bylaws provide that they "may be amended or altered by the Board at any meeting." (*Id.* at 10.)

The Amended Tau Bylaws do not contain any provisions indicating that Tau is governed by AOII. (*See generally* Tau Amended Bylaws.)

### 3.     AOII's Version of Tau's Bylaws

AOII submitted a document that it claims contains the bylaws that govern Tau both before and after October 29, 2012. (LeForge Decl., Ex. B.) The AOII version of the bylaws indicates that Tau's annual meeting is to be held in November and that notice of such a meeting must be mailed to all members at least ten days prior to the meeting. (*Id.*) AOII's version of the bylaws is similar in most other respects to the Tau Bylaws, but contains a provision stating that "Operations of the Corporation shall be in conformance with the regulations of Alpha Omicron Pi Fraternity, Inc." (*Id.* at 5.) The purported co-president of Tau submitted a declaration stating that the bylaws submitted by AOII are not Tau's controlling bylaws, and, moreover, that she has never seen this version of the bylaws. (Second Decl. of Heather Essig-Reinhardt ¶¶ 2-3, Jan. 8. 2013, Docket No. 22.)

### B.     Tau's Board of Directors

The Tau Bylaws and the bylaws submitted by AOII provide for a seven-member board ("the Tau Board").  (Tau Bylaws at 2; LeForge Decl., Ex. B at 3.)  Board members are required to be members in good standing of Tau.  (Tau Bylaws at 2.)  The Tau Bylaws and the bylaws submitted by AOII both specify that "[t]he Board of Trustees shall have the control and management of the business funds and property of the Corporation."  (Tau Bylaws at 2; LeForge Decl., Ex. B at 4.)  The Amended Tau Bylaws provide that the Tau Board will consist of five or more members, who must also be members of the corporation.  (Tau Amended Bylaws at 3.)  Under the Amended Tau Bylaws, the Tau Board is empowered to manage "[t]he business and affairs of the corporation."  (*Id.*)

At an October 29, 2012 meeting, Tau's members purportedly elected Heather Essig-Reinhardt, Catherine Denison, Bonnie Olsen Kramer, Lynne Hardey, Joan Wigginton, and Roberta Miller-Rosenow to the Tau Board.  (LeForge Decl. ¶ 12.)  These were the same members that served on the Tau Board prior to the October 29, 2012 meeting.  (Pl.'s Reply Mem. at 14, Jan. 8, 2013, Docket No. 37.)

## III.     THE UNIVERSITY OF MINNESOTA PROPERTY

In 1931, Kathryn Bremer Matson, Tau's first president and founding member conveyed land and a house (collectively, "the Property") located at 1121 SE Fifth Street, Minneapolis, Minnesota, to Tau.  (LeForge Decl., Ex. E.)    The Minnesota Chapter then

began using the home as its residence.[9]   The parties agree that the Property is held legally

in Tau's name.   (*Id.* ¶ 15.)   Currently, thirty-three members of the Minnesota Chapter

reside at the Property.   (*Id.* ¶ 5.)

Tau's 1943 articles of incorporation provided that in the event of the corporation's

dissolution, the Property was to be conveyed to the University of Minnesota.   (First

Essig-Reinhardt Decl., Ex. T.)   Tau's current articles indicate that in the event of

dissolution all assets and property of the corporation shall be distributed to another

nonprofit entity or entities "as may be determined by the Board of Directors to be most in

accord with the purposes of the Corporation."   (*Id.*, Ex. C at 8.)

Tau has historically maintained and operated the Property with room and board

fees collected from Minnesota Chapter members who reside in the home.   (*Id.* ¶ 12; Decl.

of Veronica Kentish, ¶ 2, Jan. 4, 2013, Docket No. 18; Decl. of Jayne Lindholm ¶ 5,

Jan. 8, 2013, Docket No. 24.)   Tau asserts that it entered into individual lease agreements

with each member resident and collected rent directly from the residents.   (First Essig-

Reinhardt Decl. ¶ 12.)   AOII contends, without documentation, that it "has provided

substantial services and benefits to the [Property], including property management

---

[9] The record contains very little documentary evidence as to the purchasing, financing, and construction of the Property.   Each side makes various unsupported contentions.   For example, Tau alleges that the father of Kathryn Bremer Mason purchased the property, conveyed it to Tau, Tau repaid him, and subsequently Tau raised money to build the residential building in 1930. (Essig-Reinhardt Decl., ¶¶ 9-11.)   Although a 1929 letter indicates that an "Adolf Bremer" may have purchased the property, the sequence of events related by Tau is at odds with the deed produced by AOII, which indicates that the Property was conveyed by Kathryn Bremer Mason directly to Tau in 1931.   (*See id.*, Ex. E.)   Furthermore, AOII contends that the construction of the residential home was financed by a loan from AOII, but provides no documentation supporting this claim.   (LeForge Decl. ¶ 14.)

services, educational support, house director training and vendor contracts." (LeForge Decl. ¶ 16.) Additionally, AOII claims that it has historically paid the taxes on and provided insurance for the Property. (*Id.*)[10] Tau, similarly without documentation, claims that Tau, not AOII, pays the taxes on the Property.

## IV.  AOII PROPERTIES

In 2001, AOII established a subsidiary, Alpha Omicron Pi Properties, Inc. ("AOII Properties") that was intended to standardize and centralize AOII's management of chapter houses and the financial resources of affiliated chapter corporations. (LeForge Decl. ¶¶ 19-21.) In 2005, AOII allegedly voted to amend its bylaws to transfer "the management of AOII's real property interests and management duties to [AOII] Properties." (*Id.* ¶ 22.)

AOII Properties implements its management through two separate programs: Corporation Services and Billhighway. (*Id.* ¶ 26.) Corporation Services provides property management services to chapter corporations, (First Essig-Reinhardt Decl., Ex. G), while Billhighway is a financial management system providing web-based budgeting and financial management tools, (LeForge Decl. ¶¶ 27-29.) Billhighway

---

[10] In support of its contention that it paid taxes on the Property, AOII submitted a property information search result print out from the Hennepin County property tax website, which lists the taxpayer on the Property as "AOII Tau Chapter, 5390 Virginia Way, Brentwood, TN 37027." (LeForge Decl., Ex. E.) This document does not seem to be dispositive of which entity actually paid the taxes on the Property, and in any case does not actually list AOII itself as the taxpayer. Further, the name of the taxpayer has since been changed to "Tau, Inc." and lists Tau's address. (*Id.*, Ex. P.) AOII alleges that "the removal of AOII's name from the property tax website was made without AOII's knowledge and consent." (*Id.* ¶ 51.)

allows AOII to collect rent and other dues directly, accounts for all chapter payments and expenses, tracks chapter financial assets, tracks the flow of funds, and uses those funds to pay chapter expenses. (*Id.* ¶¶ 30-31.) AOII contends that all chapters are transitioning, on a set schedule, to using Corporation Services and Billhighway. (*Id.* ¶ 31.)

As part of implementing its new management initiatives, AOII requested that affiliated chapter corporations amend their articles of incorporation to include the following clauses:

> The corporation is a wholly owned subsidiary of Alpha Omicron Pi Fraternity, Inc., a Tennessee not for Profit Corporation. Alpha Omicron Pi Fraternity, Inc., is the only member with voting authority.
>
> In the event that (name of chapter) Chapter is closed, after all financial obligations of the chapter and corporation have been satisfied, all remaining assets, real and personal, tangible and intangible, shall be transferred to Alpha Omicron Pi Fraternity, Inc. a Tennessee not-for-profit corporation; and unless there is a ruling to the contrary by Alpha Omicron Pi Fraternity, Inc. the corporation shall be dissolved.

(First Essig-Reinhardt Decl. ¶ 21, Ex. H.)

## V.   TAU'S INITIAL INVOLVEMENT WITH AOII PROPERTIES

### A.   Implementation of Billhighway and Corporation Services

In 2009, AOII requested that Tau close its corporate bank accounts and transfer its funds into a Billhighway account. (*Id.* ¶ 24.) AOII threatened to put the Minnesota Chapter on probation, the first step in closing the chapter, if Tau did not comply. (*Id.* ¶¶ 24-25, Exs. I-J.) Because of these threats, Tau closed its bank accounts, and has been using AOII's Billhighway service since 2009, paying approximately $5,000 per year for the service. (*Id.* ¶¶ 25-26.) The Billhighway service functions as both a bank account

and a financial management tool. (*Id.* ¶ 27.) Tau transferred funds into Billhighway, where its funds are kept separate from those of other chapters. (*Id.* ¶ 27.) Tau can view the activity on the account and submit expenditures for payment, but AOII Properties actually manages the money for Tau's benefit. (*Id.* ¶¶ 23, 27.)

AOII also requested that Tau pay to use Corporation Services to manage the Property. (*Id.* ¶ 28.) As part of this request/demand AOII requested that Tau transfer title of the Property to AOII or AOII Properties. (*Id.*) On February 10, 2010, Tau sent AOII a letter "opting out of participation in . . . AOII Corporation Services." (*Id.*, Ex. K.) In the letter Tau explained, "[w]e certainly understand and appreciate the need for Corporation Services at other properties where necessary or desired, but at this time Tau is not in need of that assistance and perceives that the assistance you proposed would actually be detrimental to our future." (*Id.*) At a May 22, 2010 meeting, members of Tau allegedly decided to retain title to the Property and to retain management of the Property. (*Id.* ¶ 30.)

AOII then threatened to remove Tau's Board if Tau did not acquiesce in using Corporation Services, and Tau eventually agreed to use the service. (*Id.* ¶ 31.) In 2010 and 2011, Tau allegedly paid Corporation Services over $15,000 in management fees. (*Id.* ¶ 32.)

Despite agreeing to allow AOII Properties to manage its assets through Billhighway and Corporation Services, Tau intended to retain its "ownership rights of the [P]roperty, as well as ownership of its funds generated from rent payments that AOII Properties has been collecting from the collegiate members and managing on its behalf."

(*Id.* ¶ 16.)  Additionally, Tau never amended its articles of incorporation or bylaws to add the provisions requested by AOII stating that Tau is a wholly owned subsidiary of AOII. (*Id.* ¶ 22, Ex. C.)

### B.      Problems with Billhighway and Corporation Services

Tau alleges that it began experiencing problems with Billhighway and Corporation Services "almost immediately."  (*Id.* ¶ 33.)[11]  Tau contends that "Corporation Services incorrectly calculated Tau Corporation's operating budget, missed payroll and tax filing deadlines, failed to make timely payments on Tau Corporation loans and delayed reimbursements to Tau Corporation Board members and third-party vendors."  (*Id.*)  Additionally, Tau contends that AOII refused to pay expenditures submitted by Tau if AOII deemed the expense to be in conflict with AOII's policies.  (*Id.* ¶ 34.)  In June 2011, for example, AOII refused to process payment for legal services Tau had obtained for the purposes of learning its rights and obligations as a Minnesota nonprofit corporation.  (*Id.*)  In a June 2011 letter, an attorney retained by AOII informed Tau that a local corporation is not allowed to make legal expenditures without approval from AOII. (*Id.*, Ex. P.)  The letter further explains "it is important to know that Tau . . . is a 'managed' local corporation.  Within [AOII], a 'managed local corporation is controlled by a board and officers that are appointed by [AOII Properties] and not by local alumna." (*Id.*)  AOII paid the attorney who wrote this letter out of Tau's Billhighway account.  (*Id.*,

---

[11] Tau and AOII apparently never entered into any written agreement regarding Tau's use of Billhighway and Corporation Services.

Ex. L.)  Other invoices for third party vendors with whom Tau contracted for services remain unpaid by AOII.  (*Id.* ¶¶ 37-38.)

## VI.    TAKEOVER OF TAU

### A.    Takeover of Tau's Corporate Governance

On February 9, 2011, AOII filed documents with the Minnesota Secretary of State's Office, in Tau's name, purporting to change Tau's registered agent to Incorp Services, Inc., an International registered agent service.  (*Id.* ¶ 39, Ex. N.)  Tau allegedly filed corrections to this unauthorized filing on July 27, 2011.

The following year, AOII attempted to become more active in Tau's corporate governance.  On February 16, 2012, AOII learned that Tau had additional assets which it had not reported to AOII, allegedly in violation of AOII Billhighway requirements. (LeForge Decl. ¶ 34.)  AOII also discovered that Tau had filed its own Form 990 Tax Return which allegedly violated "AOII's long-established policy of filing one annual return for the entire fraternal organization."  (*Id.* ¶ 34, Ex. I.)[12]  The next day Kelley Shillig, an employee of AOII, sent Tau's Board an e-mail, "scheduling a [Tau] Corporation meeting" for March.  (First Essig-Reinhardt Decl. ¶ 40, Ex. O.)  By this point, Tau had retained counsel, who objected to AOII's "unlawful assertion of control over Tau Corporation's affairs," and the meeting was cancelled.  (*Id.* ¶ 41.)

---

[12] Although AOII has provided documentation of Tau's 990 filings, it has not provided documentation of its "long-standing" policy of filing a single return for the entire fraternity.

In April 2012 the executive director and the international president of AOII sent Tau a letter informing Tau that AOII "has determined that it is necessary for it to exercise the oversight vested in it by the Constitution and Bylaws of [AOII] with respect to Tau." (*Id.*, Ex. Q.)[13]  The letter explained that "[t]he executive board has determined that [the] Tau corporation board has taken a position that is in direct contravention of the Governing Documents as well as AOII's ultimate ownership interest in the real property and consequently the well being of the AOII collegiate chapter." (*Id.*, Ex. Q at 35.) Therefore, AOII told Tau's board "[y]ou are advised that you no longer have any authority under the Governing Document or otherwise to act as an officer or director of Tau Corporation," and that "[e]ffective immediately, the headquarters staff of Alpha Omicron Pi Properties, Inc., will serve as interim board members of Tau Corporation." (*Id.*)  The letter threatened the board members with suspension of their individual memberships in AOII for failure to comply with the letter.  (*Id.*)

---

[13] The AOII Bylaws provision cited to in the letter, Title I, Article V, does not contain any provision explicitly allowing AOII to exercise control over Tau's board. (LeForge Decl., Ex. A at 10-11.) The cited provision allows the AOII board to "[e]xercise diligence in furthering the growth and existence of Alpha Omicron Pi Properties, Inc., by working to achieve a transfer of all other real Property interests, holdings, current and future, into the name and under the control of Alpha Omicron Pi Properties Inc." (*Id.*, Ex. A at 11.) It is possible that this is the provision AOII was relying on. In addition, the resolution passed by the AOII board prior to the April 2012 letter indicates that the Board was relying, to some extent on Tau's "1994 corporation bylaws (on file) Article V, Section 11, which states, 'Operations of the Corporation shall be in conformance with the regulations of Alpha Omicron Pi Fraternity, Inc.'" (First Essig-Reinhardt Decl., Ex. Q at 36.) As discussed above, Tau has claimed that this version of the bylaws never governed Tau.

Tau's Board responded to the April 2012 letter, alerting AOII of Tau's concerns with Billhighway and Corporation Services, and also indicating that AOII did not have authority to take over Tau.  (*Id.*, Ex. R.)  The letter explained that Tau

> fully reject[s] the April 19, 2012 letter's position and will act (again, in accord with the legal mandates of Minnesota law) to protect and conserve the properties of our corporation against the headquarters staff of Alpha Omicron Pi Properties, Inc. OR any others who suffer the same mistaken belief that they magically can become interim board members of Tau Corporation because the Executive Board of the National fraternity wishes [the] same to occur.

(*Id.*, Ex. R at 39.)  Additional discussions then ensued.  (*Id.* ¶ 45; LeForge Decl. ¶ 36.) AOII allegedly demanded that two of its employees be appointed members of Tau's Board.  (First Essig-Reinhardt Decl. ¶ 46.)  The existing Tau Board agreed to raise this issue at the next Tau meeting.  (*Id.*)

On October 29, 2012, Tau held a corporate meeting and amended the bylaws and articles of incorporation to rename the corporation and to remove the requirement that members of Tau also be members in good standing of the Minnesota Chapter.  (*Id.* ¶¶ 47-48.)  At the meeting Tau members elected the six board members named above.  The members also elected Heather Essig-Reinhardt and Catherine Denison as co-presidents, Roberta Miller-Rosenow as Secretary, and Lynne Hardey as Treasurer.  (*Id.* ¶ 17.)

On December 3, 2012, the elected Tau Board gathered at the Property for a Tau Board meeting.  (*Id.* ¶ 49.)  Two employees of AOII entered the room, and indicated they were there to deliver a message.  (*Id.* ¶ 50.)  The executive director of AOII then handed all board members a letter, notifying the board members they had been suspended from membership in AOII.  (*Id.* ¶ 51, Ex. S.)  Additionally, Tau claims that AOII demanded

that the board members leave the Property and "threatened to take legal action for trespass should they return to the property in the future." (*Id.* ¶ 51.)

The two AOII employees then held a Tau corporate "meeting," along with more than one hundred individuals, that were allegedly members of Tau.[14] (*Id.* ¶ 52; LeForge Decl. ¶ 44.) The meeting was presided over by an AOII employee who is not a member of Tau. (First Essig-Reinhardt Decl. ¶ 54.) At the meeting, the AOII representatives removed the Tau Board, and without a vote of Tau's members substituted Kelly McDonald as the sole member of the Tau Board. (*Id.* ¶ 55; LeForge Decl, Ex. N.) Kelly then, again without a vote, appointed several other AOII representatives as officers and Tau Board members. (LeForge Decl., Ex. N at 2.) The AOII representatives then amended Tau's articles and bylaws to bring them into conformity with AOII's governing documents. (First Essig-Reinhardt Decl. ¶ 56.) Notice was not provided to Tau members for this meeting and individuals allegedly voted for the provisions who were not members of Tau. (*Id.* ¶¶ 57-58; *see, e.g.*, Decl. of Erin Mason ¶ 3, Jan. 8, 2013, Docket No. 28.)

---

[14] It is unclear from AOII's statements whether the one hundred individuals were already in attendance at the December 3 meeting when the AOII representatives informed the Tau Board members that their membership in AOII had been suspended, or whether the one hundred individuals arrived with AOII's representatives, and then stayed for the remainder of the meeting. (LeForge Decl. ¶ 46.) It is also unclear whether these individuals attended the meeting and became members of Tau in order to cast a vote, or whether one hundred individuals who were already Tau members attended the meeting. (*Id.*)

**B.     AOII's Standing Rules**

In February 2012, after Tau had already retained Billhighway and Corporation Services to manage its assets, AOII adopted a number of Standing Rules.  The Standing Rules state that "Alpha Omicron Pi Fraternity, Inc., grants, through issuance of chapter charters, the use of the Fraternity name to all collegiate chapters and their chapter corporations.  Therefore, all chapters and chapter corporations must abide by the regulations of the Fraternity as set forth in The Governing Documents of Alpha Omicron Pi and in the current Corporation and Facilities Handbook."  (LeForge Decl., Ex. A at 46.)

Additionally, the Standing Rules contain numerous provisions which purport to give AOII and AOII Properties control over chapter corporations.  For example, the Standing Rules provide "[i]f the chapter corporation is managed by Alpha Omicron Pi Properties, Inc., it shall be subject to the provisions of the Governing Documents regulating the management and operations of Alpha Omicron Pi Properties, Inc." (LeForge Decl., Ex. A at 46.)  The Standing Rules further provide that

> The Fraternity retains at all times the authority to oversee, manage and otherwise control the local corporation in the best interests of the Fraternity and the chapter.  The Executive Board may establish operating standards that apply to Alpha Omicron Pi Properties, Inc., and/or those chapter corporations that are managed by Alpha Omicron Pi Properties, Inc.
>
> . . . .
>
> All chapter housing and chapter facilities . . . shall be at all times subject to the oversight of Alpha Omicron Pi Fraternity, Inc., which may, in its discretion, delegate some or all of that oversight to Alpha Omicron Pi Properties, Inc., or other officer, agent, entity or steward.

(LeForge Decl., Ex. A at 46-47.)

Finally the Standing Rules seek to transfer title of property from chapter corporations to AOII explaining:

> Although chapter real estate interests may from time to time be titled in the name of a specific chapter corporation and/or Alpha Omicron Pi Properties, Inc., all such real estate interests and other assets are assets of the Fraternity and are subject to its control, oversight and management.  To the extent such interests are titled or otherwise held in the name of specific chapter corporations, such chapter corporations were created and exist at the direction of the Fraternity and were created and intended by it to serve in the capacity of a steward for the benefit of the Fraternity in its management and oversight of chapter real estate interests.

(LeForge Decl., Ex. A at 47.)

### C.     The International Housing Approach Initiative

In response to financial situations in numerous AOII chapters which prevented those chapters from undertaking necessary residential repairs and updates, AOII Properties developed an International Housing Approach ("IHA").  (LeForge Decl. ¶ 24.) AOII describes IHA as a program designed to achieve AOII Properties' "mission of utilizing all the assets and resources of AOII for the betterment of all AOII chapters." (*Id.*)   The IHA essentially pools "the Fraternity's collective assets" (which AOII and AOII Properties consider to include all assets of chapter corporations), and AOII then redistributes those assets based on need – primarily to help chapter corporations finance major renovation projects.  (Decl. of Catharine Denison, Ex. A at 1, Ex. B at 13, 15,

Dec. 19, 2012, Docket No. 5.)[15]   Under the IHA, redistribution can take the form of leveraging a chapter corporation's assets, mortgaging a chapter corporation's real property, or requiring a chapter corporation to loan money to another chapter corporation, and such redistribution can occur without the consent of the involved chapter corporations at the sole discretion of AOII's executive board.  (*Id.*, Ex. A at 5-6, Ex. B at 16.)

In December 2012, AOII Properties sent Denison, the co-president of Tau, two documents explaining the IHA.  (Decl. of Catharine Denison, ¶¶ 4-5, Exs. A-B.)  It appears that the present lawsuit was filed in response to the December 3 meeting and the receipt of these documents.  Tau contends that these documents state that AOII and AOII Properties "intend to mortgage, leverage and/or dispose of Tau Corporation's assets without Tau Corporation's consent."  (Pl.'s Reply Memo. at 1, 3 Jan. 8, 2013, Docket

---

[15] For example, the "Q & A" pamphlet about IHA distributed to Tau states in response to the question "My housing corporation is successful and we have built-up reserves, why would I want Alpha Omicron Pi Properties to control my housing corporation?" that

> In today's world, repairs and maintenance are expensive.  Major repairs may be in excess of a million dollars.  Every house is going to face significant capital needs at some point.  Also, the ongoing property management, banking, insurance, legal, accounting and overall regulatory environment continues to be more complex with unlimited pitfalls for the unwary.  Alpha Omicron Pi Properties relies upon a team of experts in each field to assist us in navigating these complex issues.

> More importantly, ALL Fraternity resources are dedicated for the best interests of the Fraternity as a whole.  The exceptional experiences created for our members are funded through resources beyond each member's chapter.  By viewing our housing responsibilities on an international Fraternity-wide basis we are able to ensure that every collegia[te] and alumnae member benefits.  By pooling the real estate portfolio all members can be treated equitably . . . ."

(Catharine Denison Decl., Ex. A at 3.)

No. 37.)  These documents do not specifically reference Tau, and Tau has identified no other communication in which Defendants stated that they intended to leverage Tau's assets or mortgage the Property.  AOII claims that the Property and Tau "have never been identified as potential sources to finance AOII's upcoming capital expenditures through the IHA strategy."  (LeForge Decl. ¶ 24.)  AOII further claims that "[t]hose chapters that were included in the IHA were previously notified and all have willingly agreed to participate in order to assist their sister corporations.  Tau is not among those corporations."  (*Id.*)

## ANALYSIS

## I.      STANDARD OF REVIEW

The Court considers four factors in determining whether to issue a preliminary injunction or temporary restraining order: (1) the probability that the moving party will succeed on the merits; (2) the threat of irreparable harm to the moving party; (3) the balance of harms as between the parties; and (4) the public interest.  *See Roudachevski v. All-Am. Care Ctrs., Inc.*, 648 F.3d 701, 705 (8th Cir. 2011); *see also Callerons v. FSI Int'l, Inc.*, Civ. No. 12-2120, 2012 WL 4097832, at *2 n.5 (D. Minn. Sept. 18, 2012) (explaining that these factors apply to both preliminary injunctions and temporary restraining orders).  "At base, the question is whether the balance of equities so favors the movant that justice requires the court to intervene to preserve the status quo until the merits are determined."  *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 113 (8th Cir.

1981).   The burden of establishing the propriety of an injunction is on the movant. *Watkins, Inc. v. Lewis*, 346 F.3d 841, 844 (8th Cir. 2003).

## II.   LIKELIHOOD OF SUCCESS ON THE MERITS

As to the first factor, the moving party, Tau, must show that it has a "fair chance of prevailing" on its claims.   *Planned Parenthood Minn., N.D., S.D. v. Rounds*, 530 F.3d 724, 732 (8th Cir. 2008) (en banc).   Likelihood of success does not, however, require the moving party to "'prove a greater than fifty percent likelihood that [it] will prevail on the merits.'"   *PCTV Gold, Inc. v. SpeedNet, LLC*, 508 F.3d 1137, 1143 (8th Cir. 2007) (quoting *Dataphase Sys.*, 640 F.2d at 113).   In considering whether a movant is likely to prevail on the merits, "a court does not decide whether the movant will ultimately win." *Id.*

### A.   Declaratory Judgment

Tau's complaint seeks a declaration that it is the sole fee owner of the Property. Tau's complaint also requests a declaration that the December 3, 2012 meeting conducted by AOII representatives "was a sham that did not comply with Tau Corporation's Bylaws or Minnesota law, and has no legal effect, and that Tau Corporation's business affairs are rightfully managed by those elected to office by the Tau Corporation membership at a special meeting on October 29, 2012." (Compl. at 19, Dec. 19, 2012, Docket No. 1.)[16]

---

[16] Tau has since filed an amended complaint.   (Am. Compl., Sept. 3, 2013, Docket No. 60.)   This Order is based upon the original complaint filed in conjunction with the motion for a preliminary injunction.

Whether AOII owns or controls Tau's operations and assets is at the heart of Tau's claim for declaratory judgment. The parties have presented two competing sets of bylaws that they allege governed Tau prior to October 29, 2012. Which set of bylaws governed/govern Tau has significant implications for the legal analysis relative to Tau's likelihood of success on the merits. Because the Court is unable to ascertain, at this early stage of litigation, which bylaws actually governed Tau prior to October 29, 2012, it will analyze both sets of purported bylaws.

### 1. Assuming the Tau Bylaws govern

If the Tau Bylaws govern, Tau has a fair chance of proving that AOII's attempted assertions of control over Tau's corporate governance, its assets, and the Property are invalid. Significantly, the Tau Bylaws do not contain the language "Operations of the Corporation shall be in conformance with the regulations of Alpha Pi Omicron Fraternity, Inc." (*See* Tau Bylaws.) Instead, the Tau Bylaws indicate that Tau's Board "shall have the control and management of the business funds and property of the Corporation." (*Id.*)

AOII appears to rely upon several provisions of the Standing Rules to assert that it has full control over and ownership of Tau and its assets. However, under the Tau Bylaws, it appears that AOII's Standing Rules are not binding upon Tau.

In support of its alleged right to control Tau, AOII first cites to the Standing Rule which states that a chapter corporation must "abide by the regulations of the Fraternity," and that AOII "retains at all times the authority to oversee, manage and otherwise control the local corporations in the best interests of the Fraternity." AOII has not cited to, nor

- 23 -

has the Court found, any authority for the proposition that a corporation's bylaws alone can confer upon the corporation the right to control another entity.  Simply saying that AOII has a right to control Tau does not make it so.  For example, if AOII's bylaws said that it has the right to control the Walt Disney Company, that provision would have no legal effect and would not be binding upon the Walt Disney Company.  The Standing Rule indicating that any real estate interests held by chapter corporations are actually the property of AOII is not binding on Tau for the same reason.  A corporation cannot claim another corporation's property simply by including such a claim in its bylaws.

AOII's reliance on the Standing Rules to support its control of Tau (assuming that the Tau Bylaws are bylaws that governed Tau prior to October 29, 2012) improperly conflates a fraternity **chapter** with a fraternity chapter's **affiliated corporation**.  AOII appears to be suggesting that because Tau is associated with the Minnesota Chapter, AOII can regulate Tau in the same way AOII can regulate the Minnesota Chapter.  Courts have, however, recognized that a chapter (over which AOII admittedly has full control – including creation and dissolution) is different than and distinct from a corporation.  *See, e.g.*, *Waddill v. Phi Gamma Delta Fraternity Lambda Tau Chapter Tex. Tech Univ.*, 114 S.W.3d 136, 141 (Tex. Ct. App.) (explaining that a fraternity chapter is an unincorporated association which "is a voluntary group of persons, without a charter, formed by mutual consent for the purpose of promoting a common enterprise or prosecuting a common objective," whereas "[a] corporation – whether for-profit or not-for-profit – is a distinct legal entity which comes into existence by a charter from the state." (internal quotation

marks omitted)).   Therefore, AOII's control over the Minnesota Chapter does not automatically vest it with the right and authority to control Tau.

Additionally, AOII relies upon the provision in the Standing Rules stating that "[i]f the chapter corporation is managed by Alpha Omicron Pi Properties, Inc., it shall be subject to the provisions of the Governing Documents regulating the management and operations of Alpha Omicron Pi Properties, Inc."  However, it does not appear at this stage in the litigation that this provision can be binding upon Tau because the Standing Rules were adopted in February 2012, years after Tau had agreed to use Billhighway and Corporation Services.  Nor does it appear from the record that Tau was given notice of these changes or allowed to discontinue its use of Billhighway and Corporation Services. *See Douglas v. U.S. Dist. Court for Cent. Dist. of Cal.*, 495 F.3d 1062, 1066 (9th Cir. 2007) ("[A] party can't unilaterally change the terms of a contract; it must obtain the other party's consent before doing so.").  Therefore it appears unlikely that AOII can rely upon retroactive rulemaking to legally gain control of a separate corporation and its assets.

Finally, AOII challenges Tau's actions taken at the October 29, 2012 meeting. AOII has raised numerous challenges such as lack of notice, lack of a quorum, and improper proxy voting in connection with the amendment to the bylaws and the election of the current purported board.  As an initial matter, if Tau's version of the bylaws is correct, AOII was not a member or director of Tau at the time of the October meeting, and therefore lacks standing to challenge the actions of Tau.  *See, e.g.*, *Gloria Dei Lutheran Church Mo. Synod v. Gloria Dei Lutheran Church of Cold Spring, Minn.*, 513

- 25 -

N.W.2d 488, 490-91 (Minn. Ct. App. 1994).   Furthermore, even if the actions at the October 2012 meeting were invalid, rendering the amendment to the bylaws and election of directors void, the result would be that the Tau Bylaws would continue to govern the corporation, not that AOII would take control of the corporation.   Therefore, the Court concludes that if the Tau Bylaws are the bylaws that governed Tau prior to October 29, 2012, Tau has demonstrated a likelihood of success on its claim for declaratory judgment that Tau, not AOII, is the owner of the Property[17] and has the legal right to control Tau's governance and assets.

### 2.   Assuming AOII's version of the bylaws governs

If the version of Tau's bylaws produced by AOII governs, a different analysis is required.   The version of the bylaws produced by AOII contains the language "[o]perations of the Corporation shall be in conformance with the regulations of Alpha Omicron Pi Fraternity Inc."   The Court must determine whether this provision operates to incorporate by reference all of AOII's governing documents – including the Standing Rules.   Specifically, the Court must determine whether agreeing to operate in

---

[17] AOII also argues that declaratory judgment as to the Property is inappropriate because AOII is the equitable owner of the Property.  AOII claims equitable ownership because members of its sorority live in the residence located on the Property.   "Equitable title is 'a title that indicates a beneficial interest in property and that gives the holder the right to acquire formal legal title.'"   *Crossroads Church of Prior Lake, Minn. v. Cnty. of Dakota*, 800 N.W.2d 608, 614 (Minn. 2011) (quoting *Black's Law Dictionary* 1493 (9th ed. 1999)).  Equitable title can arise, for example, when a purchase agreement has been signed and the buyer has taken possession of the house, but the deed has not yet been delivered by the seller.  *See, e.g.*, *Novus Equities Corp. v. EM-TY P'ship*, 381 N.W.2d 426, 429 (Minn. 1986).   The concept of equitable title does not apply in this case.  Simply because members of AOII live at the Property does not render AOII the owner of the Property.

conformance with AOII's regulations subjects Tau to the provision in the Standing Rules that AOII "retains at all times the authority to oversee, manage and otherwise control the local corporation," and that the Property is actually an asset of AOII.

At first blush, it would seem that if AOII's version of the bylaws is correct, AOII does have the right to control Tau, and take title to its property. The bylaws submitted by AOII clearly state that Tau is required to operate in conformance with AOII's regulations, which presumably include the Standing Rules.[18] Pursuant to these rules, AOII has the authority to control Tau and owns all of Tau's assets, including the Property. But this analysis is incomplete. While Minnesota corporations are generally free to adopt and amend bylaws as they see fit, any such bylaws "must be fair and reasonable." *Bosch v. Meeker Coop. Light & Power Ass'n*, 91 N.W.2d 148, 152 (Minn. 1958). Additionally, as a matter of general corporate law, a bylaw which is fair and reasonable on its face must also be applied in a fair and reasonable manner. *See Frantz Mfg. Co. v. EAC Indus.*, 501 A.2d 401, 407 (Del. 1985).

There is at least a colorable argument that the Standing Rule granting AOII unfettered discretion to "oversee, manage and otherwise control" Tau is either unreasonable on its face or unreasonable as applied. For example, AOII used the "oversee, manage and otherwise control" provision to unilaterally replace the Tau Board with AOII employees. Tau's bylaws (as produced by AOII) specifically state that directors are to be elected by the members of Tau. The action AOII took appears to

---

[18] Both parties appear to treat the Standing Rules as legally similar to bylaws. The Court discerns no reason, at this stage in the litigation, to treat the Standing Rules differently than bylaws and therefore analyzes the Standing Rules under the legal standards applicable to bylaws.

violate the Tau bylaws it produced, and divested Tau's members of their right to vote for Tau's directors.  Members of Tau have standing to challenge this action, and to challenge the "oversee, manage and otherwise control" rule that AOII relied on in taking this action.[19]  Based on this reasoning, the Court concludes that even if the bylaws produced by AOII governed Tau prior to October 29, 2012, Tau has demonstrated that the Standing Rules vesting control of Tau's assets and governance in AOII may lack force.  Therefore, Tau has shown a likelihood of success as to its declaratory judgment claim, seeking a declaration that Tau, not AOII, is the owner of the Property and entitled to manage Tau's corporate governance.

### B.      Breach of Contract

Tau's complaint alleges that AOII breached a contract with Tau when it failed to pay Tau's expenses submitted to the Billhighway service and when it terminated Tau's access to its Billhighway account in 2012.  This claim relates directly to the injunctive

---

[19] Furthermore, bylaws are interpreted "according to rules governing the construction of contracts and statutes."  *Isaacs v. Am. Iron & Steel Co.*, 690 N.W.2d 373, 376 (Minn. Ct. App. 2004).  The Court's role in interpreting bylaws is thus to "ascertain and give effect to the intention of the parties."  *Metro. Sports Facilities Comm'n v. Gen. Mills, Inc.*, 470 N.W.2d 118, 122-23 (Minn. 1991).  Numerous provisions of the bylaws produced by AOII conflict with provisions in AOII's governing documents.  For example, the bylaws produced by AOII state that Tau's Board shall have the control and management of the business funds and property of the corporation.  (LeForge Decl, Ex. B at 4.)  However, AOII's Standing Rules directly contradict this statement.  Additionally, any provision in Tau's bylaws that gives Tau's members rights to do certain things (such as vote, attend meetings, receive notice, etc.) are all in conflict with the overarching position in AOII's Standing Rules which give AOII unfettered control over Tau that AOII may exercise in any manner and at any time.  Therefore, even if the version of the bylaws produced by AOII was controlling on Tau, the Court would be required to construe these ambiguous bylaws, and it is not clear that the provisions granting overarching control to AOII, which are inconsistent with much of Tau's other bylaws, would be given effect by the Court.

relief sought because the alleged breach is preventing Tau from controlling its corporate funds.

To state a claim for breach of contract, a plaintiff must show "(1) formation of a contract, (2) performance by plaintiff of any conditions precedent to [its] right to demand performance by the defendant, and (3) breach of the contract by defendant." *Park Nicollet Clinic v. Hamann*, 808 N.W.2d 828, 833 (Minn. 2011).

The parties do not appear to dispute that a contract was formed between AOII and Tau for Tau's use of the Billhighway service. Tau alleges that pursuant to this unwritten contract, AOII Properties was required to pay Tau's corporate expenses out of Tau's Billhighway service. AOII Properties does not dispute that it failed to pay those expenses. AOII has not identified any portion of the purported agreement that allowed it to unilaterally disallow legitimate corporate expenses to be paid out of Tau's Billhighway account. Although the parties have discussed the contract arising out of Tau's use of the Billhighway service in only the most general terms, it appears that there is a likelihood that Tau will succeed on the merits of its claim that AOII Properties' failure to pay Tau's legitimate corporate expenses breached AOII Properties' obligations under the Billhighway agreement. Furthermore, AOII appears to concede that its seizure of control over Tau's Billhighway account was based upon its alleged right to exercise complete control over Tau. As discussed above, Tau has demonstrated a likelihood of prevailing on its claim that AOII does not have the authority to unilaterally control Tau's corporate governance. Therefore, the Court finds that Tau has also demonstrated a likelihood of

success with respect to its claim that AOII Properties breached its contract when it terminated Tau's access to Tau's own Billhighway account and its corporate funds.[20]

## III.   IRREPARABLE HARM

Tau identifies three possible irreparable harms in support of its motion for a preliminary injunction.  First, Tau argues that irreparable harm exists because it has been unable to use and exercise control over the Property and because AOII has threatened to mortgage or sell the Property.  Second, Tau argues that AOII's threat to prosecute Tau's board members for criminal trespass constitutes irreparable harm.  Finally, Tau argues that "a threat of irreparable harm exists where, as here, the Defendants have taken

---

[20] Tau's complaint also brings claims for breach of fiduciary duty, unjust enrichment, conversion, and civil theft arising out of AOII's operation of Billhighway.  The Court need not address the likelihood of success on these claims because it does not appear that any of the relief sought in Tau's motion for a preliminary injunction arises out of these claims.  *See United Healthcare Ins. Co. v. AdvancePCS*, 316 F.3d 737, 742-43 (8th Cir. 2002) (finding that demonstration of the likelihood of success on a single claim entitling plaintiff to injunctive relief was sufficient, without analyzing the likelihood of success on plaintiff's other claims). Furthermore, these claims appear to allege only economic loss, which does not by itself constitute irreparable harm unless "the loss threatens the very existence of [Tau]'s existence." *See Packard Elevator v. Interstate Commerce Comm'n*, 782 F.2d 112, 115 (8th Cir. 1986). Therefore, with respect to these other claims, Tau has not met its burden of demonstrating the propriety of a preliminary injunction.  The breach of contract claim, on the other hand, does not allege solely monetary damages.  Instead, the claim addresses loss of money that could threaten Tau's very existence.  According to the breach of contract allegations, AOII Properties is preventing Tau from accessing any of its corporate funds and refusing to pay Tau's corporate expenses.  Monetary damages after the conclusion of litigation would be insufficient to fully compensate Tau if AOII Properties' failure to pay bills resulted, for example, in Tau's dissolution.  Furthermore, a portion of the breach of contract claim relates to AOII Properties preventing Tau from accessing its Billhighway account.  This portion of the claim does not implicate money damages, but instead relates to Tau's ability to control its corporate governance and finances, the loss of which can constitute irreparable harm. *See Davis v. Rondina*, 741 F. Supp. 1115, 1125 (S.D.N.Y. 1990) (finding that loss of a voice in the management of a company constituted irreparable harm).

- 30 -

unlawful actions to interfere with Tau Corporation's corporate governance and business affairs[.]"  (Pl.'s Reply Mem. at 4, Jan. 8, 2012, Docket No. 37.)

To demonstrate irreparable harm, "a party must show that the harm is certain and great and of such imminence that there is a clear and present need for equitable relief." *Iowa Utilities Bd. v. FCC*, 109 F.3d 418, 425 (8th Cir. 1996).  The Eighth Circuit has held that "[m]onetary relief fails to provide adequate compensation for an interest in real property, which by its very nature is considered unique."  *O'Hagan v. United States*, 86 F.3d 776, 783 (8th Cir. 1996).  Other courts have found that irreparable harm caused by the deprivation of the right to use and exercise control over an owned property is not limited to property that functions as a plaintiff's personal residence.  *Varsames v. Palazzolo*, 96 F. Supp. 2d 361, 367 (S.D.N.Y. 2000).

The Court finds that Tau has demonstrated a threat of irreparable harm with respect to the Property.  Although AOII has represented that it has no existing plans to mortgage or sell the Property, AOII has demonstrated a willingness to act swiftly and unilaterally with respect to Tau's governance and management, suggesting that a decision to mortgage or dispose of the Property may be made and executed in the absence of a Court order preventing such an action.  Although AOII alleges that the Property was not initially designated as a property to be sold or leveraged, the International Housing Initiative appears to be an ongoing project, suggesting that an initial failure to designate the Property as one subject to the Initiative would not preclude AOII from later selling or mortgaging the Property.  Furthermore, AOII does not dispute that is has banned the Tau

Board from entering the Property. Thus, Tau is being deprived of the right to access and control its property.

Additionally, loss of control of a corporation can constitute irreparable harm. *See Davis v. Rondina*, 741 F. Supp. 1115, 1125 (S.D.N.Y. 1990) (finding that loss of a voice in the management of a company constituted irreparable harm); *Grumman Corp v. LTV Corp.*, 527 F. Supp. 86, 105 (E.D.N.Y. 1981) (finding that a corporate takeover that threatened to "seriously disrupt" a corporation's business could constitute irreparable harm). Here, it is undisputed that AOII has taken over Tau's corporate governance, held meetings in Tau's name, purported to amend Tau's bylaws and articles of incorporation, and has taken over control of Tau's funds and Billhighway account. These actions threaten to seriously disrupt Tau's ability to function as a corporation. Furthermore, Tau has lost any right to provide input regarding its own corporate actions.

For these reasons, the Court finds that Tau has demonstrated irreparable harm based upon AOII's takeover of Tau's Property, governance, and finances.

## IV. BALANCE OF HARMS

Before granting a preliminary injunction, the Court must consider how the threat of irreparable harm to the moving party weighs against "any injury an injunction would inflict on other interested parties." *Gen. Motors Corp. v. Harry Brown's, LLC*, 563 F.3d 312, 316 (8th Cir. 2009). Here, if the injunction is not granted, Tau will lose its Property, control over its corporate structure, and control over all of its assets. AOII, on the other hand, contends that AOII's members obtain educational, social, and professional benefits

of being members of a prestigious sorority and they will not be able to receive those benefits if AOII is not allowed to exert complete control over Tau.  Furthermore, AOII argues that Tau has been mismanaging the Property which adversely affects the Minnesota Chapter.

The Court finds that the balance of harms favors Tau.  The harms faced by Tau are irreparable, and related directly to the injunctive relief sought.  The harms identified by AOII, however, are more general, and do not appear to relate directly to the injunctive relief sought.  For example, it is unclear how granting an injunction that prevents AOII from selling or mortgaging the Property would harm the Minnesota Chapter's members.  Furthermore, it is unclear how allowing the Tau Board to regain control of Tau, pending the resolution of the merits, would require AOII to terminate the Minnesota Chapter and deprive the Minnesota Chapter members of the benefits of their membership.  Therefore, the balance of harms weighs in favor of granting a preliminary injunction.

## V.     THE PUBLIC INTEREST

Tau contends that granting a preliminary injunction would serve the public interest of respecting the corporate form and enforcing corporate bylaws.  Additionally Tau argues that protecting property rights is in the public interest.  AOII argues that the public interest would be harmed by granting a preliminary injunction because it would be disruptive and contrary to AOII's purpose of supporting educational, philanthropic, and professional opportunities for its members.  Again, the harms identified by AOII appear overbroad in comparison to the injunctive relief sought.  Granting a preliminary

injunction would serve the public interest by protecting the corporate form and property interests, and it is not clear how the preliminary injunction will undermine the public interests raised by AOII.   Therefore, the Court finds that this factor weighs slightly in favor of granting a preliminary injunction.

## VI.   SCOPE OF PRELIMINARY INJUNCTION

Finally, AOII argues that a preliminary injunction is inappropriate because Tau has been subject to AOII's governance for years, and therefore any injunction would represent a departure from the status quo.   *See Conveo Corp. v. S. Graphic Sys., Inc.*, Civ. No. 08-5521, 2009 WL 161210, at *3 (D. Minn. Jan. 22, 2009) (explaining that a preliminary injunction is not meant to "go back in time and recapture the status quo of an earlier time").   Tau has been using the services of AOII Properties for a number of years and a preliminary injunction preventing AOII Properties from continuing to manage Tau's finances and the Property through Corporation Services and Billhighway would therefore likely be inappropriate.[21]   But that is not the relief sought by Tau's motion. Instead, Tau seeks to prevent AOII from exercising unilateral and total control over Tau's corporate governance, preventing Tau access to its Billhighway account, and mortgaging or selling the Property.   Although AOII is currently exercising control over Tau's corporate governance, a preliminary injunction can appropriately enjoin a defendant from engaging in certain actions, even if the defendant is already taking such actions at the

---

[21] AOII also argues that, pursuant to the Local Rules, the Court cannot consider Tau's motion because Tau never filed and served a proposed order in this case.   The Local Rules do not require a proposed order to be filed and served when a party is requesting emergency injunctive relief.   D. Minn. LR 7.1(d)(3).   Therefore, the Court may properly consider Tau's motion.

time a motion for an injunction is filed. *See Reg'l Multiple Listing Serv. of Minn., Inc. v. Am. Home Realty Network, Inc.*, Civ. No. 12-965, 2012 WL 4470286, at *11 (D. Minn. Sept. 27, 2012) (enjoining a defendant from displaying certain copyrighted images, even though the defendant was already displaying the images on its website).

The injunction sought by Tau is, however, complicated by the fact that the true governing board of Tau is unknown, as both the October 29, 2012 and the December 3, 2012 elections are challenged. Allowing an unelected board to manage Tau's corporate governance would not further the purposes of the injunctive relief Tau seeks. Therefore, in order to ensure that Tau's corporate governance is controlled by duly elected officers, the Court will reinstate the Tau Board that governed prior to October 29, 2012, pending resolution of this matter on the merits.

## VII.   SECURITY REQUIREMENT

Federal Rule of Civil Procedure 65 provides that a preliminary injunction or a temporary restraining order shall only issue if the applicant "gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c).

AOII has not addressed this issue, and has not "attempted to quantify any dollar amount of harm that it may face from a wrongly issued injunction." *See Northshor Experience, Inc. v. City of Duluth, Minn.*, 442 F. Supp. 2d 713 (D. Minn. 2006). Instead, AOII has only discussed general harms to the ability of its members to obtain the benefits of membership in a national fraternity organization. In the absence of any evidence

establishing an approximation of the monetary harms AOII would suffer due to a wrongly issued injunction, the Court will exercise its discretion to waive the security requirement in this case.

## ORDER

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that Plaintiff's Motion for Temporary Restraining Order [Docket No. 2] is **GRANTED in part** and **DENIED in part** as follows:

1.     The Court reinstates the Tau Board that governed the corporation prior to the October 29, 2012 election, pending resolution of this matter on the merits.

2.     Defendants are directed to pay pending invoices submitted by Plaintiff for Tau corporate expenses out of Plaintiff's Billhighway account, not including litigation costs and attorneys' fees incurred in this matter.

3.     Defendants are enjoined from:

a.     mortgaging, financing or in any way leveraging the building or assets located at 1121 SE Fifth Street, Minneapolis, Minnesota, including the land, building and furnishings;

b.     interfering with Plaintiff's rights as the owner of the land and property located at 1121 SE Fifth Street to be on the premises, including the right to have its designated agents on the Property;

c.      transferring, moving, or using any of Plaintiff's funds without obtaining prior written authorization from the reinstated Tau Board; and

d.      acting as Tau, or otherwise interfering with Tau's corporate governance, including, but not limited to, filing documents with the Minnesota Secretary of State on behalf of Tau, holding Tau corporate meetings, and amending Tau's governing documents.

4.      Defendants are authorized to continue managing the Property pursuant to the parties' agreement regarding the use of Corporation Services.

5.      Plaintiff is not required to provide security in seeking injunctive relief pursuant to Rule 65(c) of the Federal Rules of Civil Procedure.

DATED:   September 23, 2013                    s/ John R. Tunheim
at Minneapolis, Minnesota.                         JOHN R. TUNHEIM
                                                   United States District Judge